Lloyd D. **MASON** and Walter Belcher, Plaintiffs–Appellees,

v.

Nancy Bowen **ADAMS,** Defendant–Appellee,

and

State of Colorado, Defendant–Appellant.

No. 96CA1276.

Colorado Court of Appeals, Div. III.

Dec. 26, 1997.

Rehearing Denied Feb. 5, 1998.

Certiorari Denied Aug. 24, 1998.

Gregg C. McReynolds, P.C., Gregg C. McReynolds, Englewood, for Plaintiffs–Appellees.

White & Steele, P.C., Thomas B. Quinn, Claire Diaz, Denver, for Defendant–Appellee.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Jack M. Wesoky, Senior Assistant Attorney General, Denver, for Defendant–Appellant.

Opinion by Judge BRIGGS.

Defendant, State of Colorado, appeals the order of the trial court denying its motion to dismiss, pursuant to the Governmental Immunity Act, the negligence claim filed by plaintiffs, Lloyd D. Mason and Walter Belcher. We reverse and remand for further findings.

Defendant, Nancy Bowen Adams, lost control of her car as she was attempting to pass plaintiffs' truck on a state highway. The car struck the truck, resulting in injuries to plaintiffs. The day before, the State, through the Department of Transportation's highway operations and maintenance division, had repaired and covered the roadway with "aggregate" consisting of sand and gravel.

Plaintiffs alleged the accident was caused by the negligence of the car's driver, the State, or both. The State filed a motion to dismiss the claim against it pursuant to C.R.C.P. 12(b)(1), asserting the claim was barred by sovereign immunity. The parties stipulated the trial court could rule on the State's motion based on their briefs and evidentiary submissions.

The trial court reviewed the briefs and submissions, including the reports of two experts who had determined the accident was caused at least in part by the condition of the roadway. The court's order included the following findings of fact, which are not challenged on appeal: (1) the State had repaired and laid loose gravel on the stretch of highway on which the accident occurred 30 hours prior to the collision; (2) the highway had been open to traffic since the repairs were completed; (3) the State had not posted signs warning of loose gravel; (4) the State had not "broomed" the road surface to remove excess gravel after performing the repair; (5) the painted centerline and "fog line" delineating the lane of travel were not visible because of gravel cover; (6) from the direction of the vehicles' travel the gravel was located just after a slight curve and after a slight rise in elevation; (7) traveling from that direction, it was difficult to determine whether the gravel overlay was well bonded to the road surface; (8) the gravel from the repair work had been displaced from the normal tire paths and lay at a depth of two inches or more at the shoulder, center line, and between the traveled paths of both traffic lanes; and (9) the posted speed limit was 55 miles per hour.

Based on these findings, the trial court determined that the loose gravel on the roadway constituted a dangerous condition, as defined in § 24–10–103(1), C.R.S.1997; the State should have discovered and removed or mitigated the dangerous condition before the accident occurred, either by removing the excess sand and gravel or by posting signs; and the dangerous condition had been a cause of the accident. The court therefore concluded sovereign immunity was waived pursuant to § 24–10–106(1)(d)(I), C.R.S.1997, which incorporates the definition of "dangerous condition" in § 24–10–103(1).

## I.

The State contends the trial court, in finding a waiver of immunity, erroneously construed the pertinent statutes. In effect, the State argues that, properly interpreted, § 24–10–106(1)(d)(I) shields a public entity from liability for a dangerous condition consisting of excess sand and gravel on a public road in all circumstances in which the public entity has not had actual notice of the condition. We disagree, but conclude that the cause must be remanded for further proceedings and findings.

A motion to dismiss based on sovereign, or governmental, immunity presents an issue of subject matter jurisdiction governed by C.R.C.P. 12(b)(1), and the trial court's resolution of the issue will not be reversed unless clearly erroneous. *Trinity Broadcasting of Denver, Inc. v. City of Westminster*, 848 P.2d 916 (Colo.1993). The party seeking to establish the public entity's liability has the burden of proving jurisdiction. *See Reynolds v. State Board for Community Colleges & Occupational Education*, 937 P.2d 774 (Colo.App.1996).

The propriety of the trial court's ruling hinged on the interpretation and application to the record before it of two provisions in the Governmental Immunity Act. The first, § 24–10–103, provides in relevant part:

As used in this article, unless the context otherwise requires:

(1) 'Dangerous condition' means a *physical condition* of a facility ... which constitutes an *unreasonable risk* to the health or safety of the public, which is known to exist or *which* in the exercise of reasonable care *should have been known* to exist and which condition *is proximately caused by the negligent act or omission of the public entity* in constructing or maintaining such facility.... For purposes of this subsection (1), a dangerous condition should have been known to exist if it is established that the condition had existed for such a period of time and was of such a nature that, in the exercise of reasonable care, such condition and its dangerous character should have been discovered.... *The mere existence* of wind, water, snow, ice, or temperature *shall not,* by itself, constitute a dangerous condition. (emphases added)

Section 24–10–106(1), C.R.S.1997, provides for the waiver of sovereign immunity in certain circumstances, including those described in the second provision relevant here, § 24–10–106(1)(d)(I):

A *dangerous condition* of a public highway, road, or street which ... was designed and intended for public travel or parking thereon.... Nothing in this subparagraph (I) shall *preclude* a particular dangerous *accumulation of* snow, ice, *sand,* or *gravel from being found to constitute a dangerous condition* ... when the entity fails to use existing means available to it for removal or mitigation of such accumulation *and* when the public entity had *actual notice* through the proper public official responsible for the roadway and had a reasonable time to act. (emphases added)

The proper construction of a statute is a question of law for the court to determine. *Garcia v. State Farm Mutual Insurance Co.,* 920 P.2d 843 (Colo.App.1995). The primary task in construing a statute is to determine and give effect to the intent, or purpose, of the General Assembly. *City & County of Denver v. Gallegos,* 916 P.2d 509 (Colo.1996). In doing so, we look first to the statutory language itself, giving words and

phrases their commonly understood meaning. *See Barela v. Beye,* 916 P.2d 668 (Colo.App. 1996).

In addition, when a term is defined, it must be given its defined meaning, and that definition is applicable to the term whenever it appears in the statute, unless a contrary intention plainly appears. *Allstate Indemnity Co. v. Gonzales,* 902 P.2d 953 (Colo.App.1995). We are further obliged to construe an entire statutory scheme in a manner that gives consistent, harmonious, and sensible effect to all of its parts. *See In re Marriage of Wall,* 851 P.2d 224 (Colo.App. 1992).

The State argues the trial court erred in relying on the *first* sentence in § 24–10–106(1)(d)(I), then incorporating the general definition of "dangerous condition" in § 24–10–103(1) into that sentence, and thus concluding immunity was waived because the State "should have discovered" and removed or mitigated the dangerous condition. Instead, according to the State, the court should have relied exclusively on the *last* sentence of § 24–10–106(1)(d)(I), which precludes a dangerous accumulation of, among other things, sand or gravel from being found to constitute a "dangerous condition" unless the State had "actual notice" of the roadway's condition. However, applying these basic rules of statutory construction, we reject for at least two reasons the State's suggested statutory construction.

## A.

We first reject the State's argument because, under its interpretation, only the last sentence of § 24–10–106(1)(d)(I) would apply. Hence, it would not matter that, pursuant to the definition of "dangerous condition" in § 24–10–103(1), the State could otherwise be held liable in the circumstances presented here if it had proximately caused, and should have known of, the dangerous condition. Such an interpretation, among other things, ignores the introductory clause of the subparagraph's last sentence.

The last sentence of § 24–10–106(1)(d)(I) begins by stating that "nothing" in subparagraph (I) shall "preclude" a particular dan-

gerous accumulation of gravel from being found to constitute a dangerous condition. By its plain terms, this is not an additional *preclusion* of *liability*. To the contrary, the General Assembly has plainly stated that it is the *immunity* from liability that is precluded. The scope of the waiver of immunity set forth in the preceding portion of subparagraph (I) is therefore *expanded*—not constricted. *Cf. Beck v. Buena Park Hotel Corp.,* 30 Ill.2d 343, 196 N.E.2d 686 (1964)(purpose of a "notwithstanding" clause is not to qualify or restrict the scope of the preceding provision; rather, it enumerates or designates the conditions in spite of which the provision is to apply).

Consideration of both §§ 24–10–103(1) and 24–10–106(1)(d)(I) indicates why the last sentence was added to expand the scope of the waiver of immunity. While § 24–10–106(1)(d)(I) waives sovereign immunity for a "dangerous condition" of a highway which physically interferes with the movement of traffic on the paved portion, it does not define "dangerous condition" differently than the term is defined in § 24–10–103(1). Hence, that definition must be applied to the waiver in § 24–10–106(1)(d)(I). *See Allstate Indemnity Co. v. Gonzales, supra.* The result is that the dangerous condition, among other things, must have been "caused by the negligent act or omission of the public entity...." Section 24–10–103(1).

The last sentence of § 24–10–103(1) emphasizes the importance in the statutory scheme of the cause that created the dangerous condition. It expressly states that "the mere existence" of certain naturally occurring conditions "shall not, by itself, constitute, a dangerous condition."

Neither "sand" nor "gravel" is included in the list of conditions described in the last sentence of § 24–10–103(1). What is not clear is whether the omission was intentional, perhaps because neither is typically a naturally occurring condition, or instead was an oversight at the time "sand" and "gravel" were added in 1992 to the list of conditions now appearing in the last sentence of § 24–10–106(1)(d)(I).

What is clear, in either event, is that, as a result of the definition of "dangerous condi-

tion" in § 24–10–103(1), without the last sentence of § 24–10–106(1)(d)(I) a public entity could not be liable for a dangerous condition consisting of such things as snow, ice, sand, or gravel on a roadway if it did not cause the condition. It would not matter that the danger to citizens was extreme or that the public entity had the existing means to remove or mitigate the danger, actual notice of the condition, and reasonable time to act. It is the last sentence of § 24–10–106(1)(d)(I) that *expands* the scope of the waiver of sovereign immunity to permit a public entity to be liable for an accumulation of sand and gravel in such circumstances, notwithstanding the foregoing provisions.

To the extent the statutory scheme may be deemed ambiguous, the legislative history supports our interpretation. The sentence in question, which was previously the last sentence of § 24–10–103(1), was moved to § 24–10–106(1)(d)(I) pursuant to 1992 amendments to the Governmental Immunity Act. *See* Colo. Sess. Laws 1992, ch. 172, at 1115–1116; *Click v. Board of County Commissioners,* 923 P.2d 347 (Colo.App.1996).

Although the sentence did not originally include a reference to "sand" or "gravel," the references were added when the sentence was moved. They were added in response to complaints of citizens about having windshields cracked by sand and gravel deposited on roadways during snowstorms and then not timely removed after the snow had melted. *See* Hearing on H.B. 1291 Before the Senate Local Government Committee, 58th General Assembly, 2d Reg. Sess. (Hearing tape 92–16, March 10, 1992, at 10:45 a.m. and March 11, 1992, at 1:41 p.m.). The purpose was therefore to make clear that, even if a public entity could otherwise avoid liability because it had not been negligent in depositing the sand and gravel, it could be liable in the described circumstances for failing to remove or mitigate the resulting dangerous accumulation.

In sum, we construe the last sentence of § 24–10–106(1)(d)(I) to provide that nothing in the subparagraph bars liability for a public entity, even if its negligence did *not* proximately cause a dangerous condition con-

sisting of an accumulation of sand and gravel on a roadway, if it failed to remove or mitigate the danger when it had the existing means to do so, actual notice of the condition through the proper public official responsible for the roadway, and a reasonable time to act. The last sentence does not constrict the liability imposed in the first sentence of the subparagraph. That sentence provides that a public entity may also be liable for a dangerous condition that *was* proximately caused by its own negligent act or omission in constructing or maintaining a roadway, if the entity knew or *should have known* the condition existed.

## B.

■ We also reject the State's interpretation of § 24–10–106(1)(d)(I) because it ignores another critical clause in the sentence on which it relies. By its own terms, the last sentence of § 24–10–106(1)(d)(I) applies only to an "accumulation" of sand and gravel.

*Webster's Third New International Dictionary* 13 (1986) defines "accumulation" as: "increase or growth by addition especially when continuous or repeated." Hence, when a public entity negligently causes a dangerous condition by depositing excess sand and gravel on a public roadway, and does so through conduct on a single occasion, the result may well be a dangerous condition. However, while that condition may be described, for example, as a dangerous "deposit" of sand and gravel, it is not a dangerous "accumulation."

We therefore reject the State's contention that the trial court erred in refusing to dismiss the complaint. At least when the State proximately causes a dangerous condition by negligently depositing and leaving excess sand and gravel on a public highway, it can be held liable, even though "the proper public official responsible for the roadway" did not have actual notice of the condition.

## C.

■ We must next determine whether, in light of our interpretation of the statutory scheme, the record provides a sufficient basis for resolving the motion to dismiss. We conclude it does not.

The trial court found, as matters of historical fact, that "gravel from the repair work had been displaced from the normal tire paths and lay at a depth of two inches or more at the shoulder, center line, and between the traveled paths of both traffic lanes." It further found the car's driver did not just inattentively drift off the road but was caused to do so by sand and gravel in excess of two inches deep on the traveled portion of the roadway and outside the tire paths.

The court then found that the State had negligently "created" the dangerous condition: The accident began in the patch created by the State, the condition and its dangerous character should have been discovered before the accident, and the cause was the omission of brooming or warning signs.

The findings leave unclear when and why the State "should have discovered" the dangerous condition. There are in fact several explanations for the accident, all consistent with the court's findings, but not all of which would result in the State's liability because it "should have known" of the dangerous condition.

One explanation is that the State's highway maintenance crew deposited and left an excessive amount of sand and gravel that, even without any displacement, created an unreasonable risk to the safety of the public when the road was opened to travel. Plaintiffs' expert testified in his deposition that, in his opinion, the Department of Transportation's own rules required brooming before the road was opened to travel. It was undisputed that the crew did not broom the sand and gravel after it had been deposited and rolled into the new asphalt. If the State were negligent in failing to broom excess sand and gravel, thereby causing a dangerous condition before the road was opened to travel, the State could be held liable even though it did not have "actual notice through the proper public official responsible for the roadway."

Another explanation is that the sand and gravel deposited and left on the roadway did

not at that point constitute an unreasonable risk to the safety of the public. As the trial court noted, consistent with evidence in the record, sand and gravel had been displaced by traffic from the tire paths. The court found that excess gravel *outside* the tire paths caused the accident.

In these circumstances, the sand and gravel deposited and left on the roadway may not have actually resulted in an unreasonable risk to the safety of the public until after it had been displaced by traffic. Nevertheless, so long as displacement sufficient to create an unreasonable risk to the safety of the public was a foreseeable consequence, the State could be found negligent and its negligence would still be a proximate cause of the dangerous condition, as referred to in § 24–10–103(1). *See generally CJI–Civ.3d* 9:26 & 9:27 (1988). Hence, the State could still be held liable even without actual notice.

The trial court's findings are consistent with both of these explanations for the accident, and each supports the trial court's order. However, the court's findings do not preclude other explanations.

One alternative explanation is that the State's highway maintenance crew could not have reasonably foreseen, at the time it opened the repaired road to traffic, that sufficient sand and gravel would accumulate from traffic displacement to create an unreasonable risk to the safety of the public at that location. In these circumstances, even though the State may have "created" the condition in the sense found by the trial court, the State's negligence would not be a proximate cause of the dangerous condition. *See generally CJI–Civ.3d* 9:30 (1988)(the negligence, if any, of the defendant is not a cause of any injuries to the plaintiff unless injury to a person in the plaintiff's situation was a reasonably foreseeable consequence of that negligence). Hence, pursuant to § 24–10–106(1)(d)(I), the State could be held liable only if the public official responsible for the roadway at some point after the displacement and before the accident had actual notice of the accumulation, and the State had both existing means available for its removal or mitigation and reasonable time to act.

The court's findings do not preclude this and other possible alternative explanations.

Neither does the record presented to the trial court and before us on appeal.

We have already recognized, as the trial court noted, that plaintiffs' expert opined that the State failed to follow its own rules with respect to brooming and warning signs. It could be argued the very existence of the rules indicates it was foreseeable that the failure to broom would create an unreasonable risk to the safety of the public. However, the court did not make a finding to that effect.

Furthermore, notwithstanding the parties stipulated submission of the case to the trial court, the record leaves unclear the purpose of the rules. The danger addressed by the rules might include the loss of traction between the roadway and a motor vehicle's wheels, or it might include only other risks, such as windshields being cracked or broken by flying gravel.

Moreover, the record includes a copy of the transcribed deposition of the supervisor responsible for the repair. Contrary to plaintiffs' expert, he testified that the rules requiring brooming, which are applicable to a "chip" seal, were inapplicable to the type of repair in question here, which involved deposits of sand and gravel no larger than 3/8 inch in diameter or maximum dimension. This creates a disputed issue of fact that cannot be resolved on the present record.

In light of our construction of the statutory scheme, we conclude the findings and record before us are not sufficient to resolve the State's motion to dismiss under C.R.C.P. 12(b)(1). It is therefore necessary to remand the cause for further proceedings and findings from which the trial court may then determine the applicability of §§ 24–10–103(1) and 24–10–106(1)(d)(I).

## II.

The State separately argues the trial court erred in finding that the failure to post signs warning of the loose sand and gravel constituted a dangerous condition. We agree that, pursuant to § 24–10–106(1)(d)(I), the failure to post warning signs cannot serve as the basis for finding a dangerous condition and thus a waiver of sovereign immunity. However, we do not read the trial court's

finding of a dangerous condition as based on the State's failure to post warning signs.

The trial court determined that the sand and gravel itself constituted a dangerous condition for which the State could be held liable because it should have discovered and removed or mitigated the condition. In referring to the failure to post warning signs, the court was merely observing that existing means appear to have been available for removing or mitigating the existing danger, including brooming off the excess sand and gravel and posting warning signs. Evidence that these existing means were available for mitigating the danger is relevant in apportioning fault, not only to plaintiffs and the State, but also to the car's driver.

We therefore conclude reversal of the trial court's holding is not required merely because it referred to posting signs as one of the ways of mitigating what it had determined was an already existing danger.

The judgment is reversed, and the cause is remanded for further proceedings and findings from which the trial court may then determine the applicability of §§ 24–10–103(1) and 24–10–106(1)(d)(I).

HUME and JONES, JJ., concur.